FILED

AUG 03 2011

PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, et al.<br><br>Plaintiff,<br><br>vs.<br><br>KEN SALAZAR, et al.,<br><br>Defendants. | CV 11-70-M-DWM<br>CV 11-71-M-DWM<br><br><br><br>ORDER |
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>vs.<br><br>KEN SALAZAR, et al.,<br><br>Defendants. | |

# I. Introduction

In April 2009, the United States Fish and Wildlife Service issued a final rule ("2009 Rule") that removed Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., protections from the Northern Rocky Mountain Gray Wolf Distinct

1

Population Segment in all areas outside of Wyoming. 74 Fed. Reg. 15213 et seq. Under the 2009 Rule, wolves found in Wyoming were the only wolves in the distinct population segment that received protection under the ESA. The Rule violated the ESA by protecting a listed species only across part of its range, and this Court vacated the unlawful Rule as invalid. Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207, 1228 (D. Mont. 2010). Federal Defendants, Idaho, Montana, and three sets of Defendant Intervenors appealed this Court's ruling.

While the appeals were pending, Congress passed and the President signed H.R. 1473, the Department of Defense and Full Year Continuing Appropriations Act of 2011. Section 1713 of this Act directs the Service to reissue the 2009 Rule this Court vacated:

> Before the end of the 60-day period beginning on the date of enactment of this Act, the Secretary of the Interior shall reissue the final rule published on April 2, 2009 (74 Fed. Reg. 15213 et seq.) without regard to any other provision of statute or regulation that applies to issuance of such rule. Such reissuance (including this section) shall not be subject to judicial review and shall not abrogate or otherwise have any effect on the order and judgment issued by the United States District Court for the District of Wyoming in Case Numbers 09-CV-118J and 09-CV-138J on November 18, 2010.

P.L. 112-10 § 1713, 125 Stat. 38 (April 15, 2011). On May 5, 2011, pursuant to the congressional direction in Section 1713, Federal Defendants reissued the 2009 delisting rule.

Two groups of Plaintiffs filled suit challenging the constitutionality of Section 1713. The actions were consolidated, and before the Court are cross motions for summary judgment.

The issues in this case cannot be resolved without considering the rule of law. This case presents difficult questions for me. The way in which Congress acted in trying to achieve a debatable policy change by attaching a rider to the Department of Defense and Full-Year Continuing Appropriations Act of 2011 is a tearing away, an undermining, and a disrespect for the fundamental idea of the rule of law. The principle behind the rule of law is to provide a mechanism and process to guide and constrain the government's exercise of power. Political decisions derive their legitimacy from the proper function of the political process within the constraints of limited government, guided by a constitutional structure that acknowledges the importance of the doctrine of Separation of Powers. That legitimacy is enhanced by a meaningful, predictable, and transparent process.

In this case Defendants argue—unpersuasively—that Congress balanced the conflicting public interests and policies to resolve a difficult issue. I do not see what Congress did in the same light. Inserting environmental policy changes into appropriations bills may be politically expedient, but it transgresses the process envisioned by the Constitution by avoiding the very debate on issues of political

importance said to provide legitimacy. Policy changes of questionable political viability, such as occurred here, can be forced using insider tactics without debate by attaching riders to legislation that must be passed.

However, the rule of law does not apply only to Congress; it also applies equally to the courts. The courts are supposed to apply the laws that Congress has enacted. Judges cannot make new law or write laws when those that are written by Congress are unclear or ambiguous. The Separation of Powers requires us to discern the difference between arguments of policy and arguments of principle. It is the function of Congress to pursue arguments of policy and to adopt legislation or programs fostered by recognizable political determinations. It is the function of the courts to consider arguments of principle in order to enforce a statute, even if the statute itself stems from an altered policy. This distinction holds true even when the legislative process employed involves legislative prestidigitation.

For the rule of law to function uniformly, each branch of government must recognize and acknowledge the function of the others. Fairness is dethroned and confusion is crowned queen when the laws enacted pursuant to established public policy are rendered inapplicable on an *ad hoc* basis. The rule of law demands regularity and predictability. The law must be generally applicable, and it must be clear. Prior decisions of superior courts bind the lower courts, the government and

the public because each owes a fidelity to the process. The law should be ascertainable, predictable, consistent, and like cases should be treated alike. This means that courts are generally bound by precedent and the concept of *stare decisis, et non quieta movere*, translated as "to stand by things decided, and not to disturb settled issues." Conceptually, policy is forward looking, providing notice of what the political decision is, while arguments concerning enacted laws are generally backward looking, relying on existing authorities to find the meaning of the law.

One of the reasons this case is so difficult stems from the confluence of these ideas in the conflict that needs to be decided here. In its capacity as the body charged with setting public policy Congress enacted the ESA. The policy reflected in that determination was to establish a conservation ethic for those non-human animal and plant species that are at risk of extinction. The purpose of the Act is to conserve at-risk species and the ecosystems upon which they depend. The law protects imperiled species, without regard to the popularity of the animal or plant. It does not just protect species when politically convenient. In acknowledging the political justification of the ESA President Richard Nixon said when signing the Act into law:

Nothing is more priceless and more worthy of preservation than the

rich array of animal life with which our country has been blessed. It is a many-faceted treasure, of value to scholars, scientists, and nature lovers alike, and it forms a vital part of the heritage we all share as Americans.

President Nixon's Statement on Signing the Endangered Species Act of 1973, 374 Pub. Papers 1027, 1027–1028 (Dec. 28, 1973).

Section 1713 sacrifices the spirit of the ESA to appease a vocal political faction, but the wisdom of that choice is not now before this Court. The question presented by this lawsuit, challenging the constitutionality of Section 1713 of the Department of Defense and Full-Year Continuing Appropriations Act of 2011, is whether the rider constitutes a detectable change in the law.

If I were not constrained by what I believe is binding precedent from the Ninth Circuit, and on-point precedent from other circuits, I would hold Section 1713 is unconstitutional because it violates the Separation of Powers doctrine articulated by the Supreme Court in U.S. v. Klein, 80 U.S. 128 (1871). However, our Circuit has interpreted Robertson v. Seattle Audubon Society, 503 U.S. 429 (1992), to hold that so long as Congress uses the words "without regard to any other provision of statute or regulation that applies," or something similar, then the doctrine of constitutional avoidance requires the court to impose a saving interpretation provided the statute can be fairly interpreted to render it

constitutional.

There are two ways of interpreting Section 1713. One holds that Congress did not change the underlying law but simply required the Secretary of the Interior to enforce a regulation determined by a court to be in violation of the ESA, 16 U.S.C. § 1532(16). The other way to look at Section 1713 is to hold Congress left Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207 (D. Mont. 2010) intact, and left the ESA untouched except as to a discrete agency action. Under this view, Congress changed the law and precluded judicial review only with respect to the re-issuance of the 2009 Rule. No other part of the ESA or its application has been altered, changed or amended. The argument in support of the latter view is troublesome because it leaves open the question of whether the court is left to apply its ordinary rules to new circumstances created by the Act, or whether the Act simply directs the court in the application of law without regard to the existing statutes of the ESA. See 16 U.S.C. § 1532(16); Defenders of Wildlife v. Salazar, 729 F. Supp. 2d 1207, 1228 (D. Mont. 2010).

Nonetheless, the case law requires me to adopt the latter interpretation. Therefore I find Section 1713 can be read as a change in the law to the extent that it exempts the Northern Rocky Mountain Gray Wolf Distinct Population Segment from the range concerns as articulated in the ESA. In arriving at this

7

determination it is necessary to infer Section 1713 is limited in its application to the re-issuance of the 2009 Rule.

## II. Analysis

The Ninth Circuit instructs that "[t]he constitutional principle of Separation of Powers is violated where (1) Congress has impermissibly directed certain findings in pending litigation, without changing any underlying law, or (2) a challenged statute is independently unconstitutional on other grounds." Consejo de Desarrollo Economico de Mexicali v. U.S., 482 F.3d 1157, 1170 (9th Cir. 2007). Plaintiffs allege the challenged rider violates the Separation of Powers doctrine because it was designed to moot a pending case, Defenders of Wildlife v. Salazar, without amending the ESA.[1]

The doctrine of the Separation of Powers derives from the tripartite structure of government set out in the United States Constitution. Nearly two hundred years ago Chief Justice Marshall wrote "[t]he difference between the

---

[1] Plaintiffs challenge Section 1713 under both prongs. They also allege Section 1713 is unconstitutional to the extent it prohibits judicial review of a constitutional challenge. See Webster v. Doe, 486 U.S. 592, 603 (1988) (holding serious constitutional questions arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim). But Defendants do not argue the judicial review prohibitions in Section 1713 preclude review of the Plaintiffs' constitutional challenge. Considering Defendants' position and that limitations of jurisdiction are to be construed narrowly to avoid constitutional problems, See Johnson v. Robison, 415 U.S. 361, 367 (1974), the challenged section does not unconstitutionally preclude review of constitutional challenges.

departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law." Wayman v. Southard, 23 U.S. 1, **22 (1825). Defending the Constitution in The Federalist Papers, James Madison described the Separation of Powers as essential to free government: "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self-appointive, or elective, may justly be pronounced the very definition of tyranny." Federalist No. 47 at 324 (J. Cooke ed. 1961) (J. Madison). The Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." Mistretta v. U.S., 488 U.S. 361, 380 (1989). As for the judicial branch the Supreme Court has explained that the "[f]ramers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy . . . ." Plaut v. Spendthrift Farm, 514 U.S. 211, 218–219 (1995).

When reviewing legislation alleged to improperly encroach on the Article III branch's jurisdiction, the question is how separate is separate. As the branch responsible for creating law, Congress also has the ability to manipulate the

statutes that courts interpret and apply. When Congress changes the law, the action can impact pending litigation. While a certain amount of commingling of power exists among the branches, the Separation of Powers "is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." Id. at 239. The Supreme Court's holdings in U.S. v. Klein, 80 U.S. 128 (1871), and Robertson v. Seattle Audubon Society 503 U.S. 429 (1990), provide a framework to identify when the legislative branch unconstitutionally infringes upon the judicial power.

The Supreme Court in Klein held Congress unconstitutionally violated the Separation of Powers doctrine by directing the Court to make a factual finding regarding the probative weight of a presidential pardon. Klein, 80 U.S. at 146–147 (1871). The case arose out of a claim for reimbursement of property seized during the civil war. Id. at 132. A federal statute provided that individuals who were loyal to the Union could recover compensation for seized property. The Court of Claims found a property owner had given no aid or comfort to the rebellion and that even if he had, his acceptance of a presidential pardon qualified him under the statute to recover under the act. The government appealed to the Supreme Court. Id.

Wanting to deny pardoned southerners the benefits of the statute, Congress attached a rider to an appropriations bill. Id. at 133. The rider directed courts to view acceptance of a pardon as conclusive proof of disloyalty to the federal government. Id. at 133–134. In addition, when a claimant prevailed in a compensation claim by proving loyalty by presidential pardon, the rider directed a reviewing court to remand for dismissal based on lack of jurisdiction. Id. Essentially, under the rider, cases like Klein could be reviewed only to reverse successful claims of pardoned property owners.

In holding the rider unconstitutional, the Klein Court distinguished the case from Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. 421 (1855). Wheeling Bridge involved the characterization of two bridges that a court held to be nuisances and obstructions to navigation. Subsequent legislation declared the bridges to be post roads that were lawful structures notwithstanding contrary law. Reviewing the legislation, the Supreme Court rejected Separation of Powers challenges and held Congress appropriately altered the legal nature of bridges by modifying the substantive law. Id. at 432. The Court in Klein distinguished Wheeling Bridge by explaining "no arbitrary rule of decision was prescribed in [Wheeling Bridge], but the court was left to apply its ordinary rules to the new circumstances created by the act." Klein, 80 U.S. at 147. No new circumstances

were created in Klein. Instead, the court was "forbidden to give effect to evidence which, in its own judgment, such evidence should have [.]" Id.

More than a century later the Supreme Court in Seattle Audubon Society v. Robertson reviewed a case where, like Klein, the plaintiffs alleged Congress violated the Separation of Powers. Seattle Audubon Society challenged logging policies alleged to afford inadequate protection to the northern spotted owl. Id. at 432. The district court issued a preliminary injunction that enjoined planned timber sales. Congress responded by enacting legislation known as the Northwest Timber Compromise. Id. at 433. The legislation identified pending cases and directed that the statutory requirements in those cases were met so long as new management standards created in the compromise were satisfied.

> [T]he Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al., v. F. Dale Robertson, Civil No. 89-160 and Washington Contract Loggers Assoc. et al., v. F. Dale Robertson, Civil No. 89-99 (order granting preliminary injunction) and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87-1160-FR.

Id. at 434–435. Based on the new legislation, the district court vacated the preliminary injunction. Id. at 436. Arguing that Congress impermissibly directed

results in pending litigation without changing the underlying law, several environmental groups challenged the constitutionality of the Northwest Timber Compromise.

The Supreme Court reviewed the case, and although it did not expand upon the scope of the holding in Klein, it held no Separation of Powers problem existed because the challenged subsection "compelled changes in law, not findings or results under old law." Id. at 438. As Justice Thomas explained:

> the agencies could satisfy their MBTA obligations in either of two ways: by managing their lands so as neither to "kill" nor "take" any northern spotted owl within the meaning of § 2 [of the MBTA, 16 U.S.C. § 703], or by managing their lands so as not to violate the prohibitions of subsections (b)(3) and (b)(5).

Id. By replacing the legal standards underlying the two original challenges, Congress avoided infringing upon the judicial branch. Id. at 440. Notably in Robertson, the changed law preserved the conservation ethic that is the policy foundation of the ESA.

Since Robertson, courts have interpreted Klein to mean Congress cannot direct results in pending litigation without changing the underlying law. Consejo de Desarrollo Economico de Mexicali, 482 F.3d at 1170; Ecology Center v. Castaneda, 426 F.3d 1144, 1147–1148 (9th Cir. 2005).

Federal Defendants cite Stop H-3 Association v. Dole for the proposition

that exempting an action from environmental statutes is a change in the law that puts to rest concerns that Congress arrogated the judicial branch's power. 870 F.2d 1419, 1425 (9th Cir. 1989). There, prolonged litigation over a highway construction project prompted Congress to pass a rider that relieved the highway project from environmental prerequisites in the Department of Transportation Act.[2] Id. at 1423. The Ninth Circuit held the "clear intent and effect" of the statute was to exempt the project from certain environmental requirements. Id. at 1425. The legislation in Stop H-3 changed the law because it "did not leave the underlying statute intact (as to the H-3 project)." Seattle Audubon Socy. v. Robertson, 914 F.2d 1311, 1316 (9th Cir. 1990), rev'd on other grounds, 503 U.S. 429 (1992).

A fair reading of Klein and Robertson suggests that Congress can involve itself in pending litigation under limited circumstances. Structurally the doctrine

---

[2]The challenged section in Stop H-3 required:

(a) The Secretary of Transportation shall approve the construction of Interstate Highway H-3 . . ., and such construction shall proceed to completion notwithstanding section 138 of title 23 and section 303 of title 489, United States Code [i.e. section 4(f)].

(b) Notwithstanding section 102 of this joint resolution the provisions of subsection (a) shall constitute permanent law.

Stop H-3 Assn., 870 F.2d at 1425.

of Separation of Powers is still viable, but in my view it is violated when there is an effort to change a political policy by resolution that is not clear, does not identify what law is specifically being changed, does not state what rules apply in the future, and is inconsistent with the underlying political purposes of the law that is being changed. Our Circuit has not seen Klein or Robertson this way.

According to Ninth Circuit case law, Congress can exempt a project from environmental prerequisites by implication. Consejo de Desarrollo Economico de Mexicali, 482 F.3d at 1168–1169. In Consejo de Desarrollo Economico de Mexicali, Congress directed that "[n]otwithstanding any other provision of law" a canal lining project should proceed without delay. Id. at 1167. The statute did not name a specific law that was amended. But the court held that when Congress directs an action "notwithstanding any other provision of law" a change in the law can be gleaned by identifying statutes that would prevent the action from proceeding. Id. at 1168–1169. The Ninth Circuit concluded that the "notwithstanding" phrase exempted the project from four environmental statutes that would delay implementation of the project. Id. at 1169. The D.C. Circuit has also held similar statutory language that altered pending litigation can survive a Separation of Powers challenge. Natl. Coal. to Save our Mall v. Norton, 269 F.3d 1092, 1097 (D.C. Cir. 2001) (upholding, over Separation of Powers challenge,

15

statute that insulated from judicial review the directive to construct the World War II memorial notwithstanding contrary law).

Defendants here argue Section 1713 amended law by implication. By directing the Secretary of the Interior to reissue the delisting rule "without regard to any other provision of statute or regulation," they argue the rider amended any statute that would prevent its issuance. The heart of the debate turns on whether Congress can insert into its directive a nonspecific phrase that by itself sweeps aside concerns that Congress is infringing upon the judicial power.[3]

When laws are amended by implication, questions can remain regarding how the law was changed.[4] The political process requires Congress to take stances

---

[3]In part, Plaintiffs support their legal argument by citing legislative history and extra congressional remarks made by the drafters of Section 1713. When interpreting a statute, a court looks first to the statute's plain language. Ileto v. Glock, Inc., 565 F.3d 1126, 133 (9th Cir. 2009). Only if the language is ambiguous will the court look beyond words in the statute. Id. Here the statute is clear in its directive to issue the rule without regard to conflicting law. Even if the language was ambiguous, the legislative history and extra-record remarks provide limited probative value. The remarks of the one legislator who commented on the rider is afforded little weight because he opposed the legislation. See Brock v. Writers Guild of Am. W., Inc., 762 F.2d 1349, 1356 (9th Cir. 1985). Extra record remarks also would provide limited help in divining congressional intent because "contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." Consumer Prod. Safety Commn. v. GTE Sylvania. Inc., 447 U.S. 102, 118 (1980).

[4]Justice Scalia recently criticized Congress' use of nonspecific language when he wrote, "Fuzzy, leave-the-details-to-be-sorted-out-by-the-courts legislation is attractive to the Congressman who wants credit for addressing a national problem but does not have the time (or perhaps the votes) to grapple with the nitty-gritty." Sykes v. U.S., 131 S.Ct. 2267, 2288 (2011) (Scalia J., dissenting).

16

on issues. It is not the role of the judiciary to write the law. In my view, the Ninth Circuit's deference to Congress threatens the Separation of Powers; nonspecific magic words should not sweep aside constitutional concerns.

Repeals by implication are disfavored. Tenn. Valley Auth. v. Hill, 437 U.S. 153, 189 (1978). But a practice that is disfavored is not necessarily prohibited. "A court should invalidate a statutory provision only for the most compelling constitutional reasons." Gray v. First Winthrop Corp., 989 F.2d 156, 1567 (9th Cir. 1993) (quotations omitted). Accordingly, when two possible interpretations of a statute exist, one unconstitutional and the other valid, a court must adopt the one that saves the act. Robertson, 503 U.S. at 441.

Here, like in Consejo, the legislation fails to name a law that would be amended. But the language of the rider can be construed to amend the ESA because the directive states the 2009 Rule should be reissued "without regard to any other provision of statute or regulation." The 2009 Rule violated the ESA by protecting a listed species across only part of its range and was accordingly invalidated. Defenders of Wildlife, 729 F. Supp. 2d at 1228. Because the 2009 Rule was invalidated, the re-issuance of the Rule pursuant to congressional directive, by implication amended the ESA as to this particular delisting. In other words, the ESA is no longer intact as to the re-issuance of the 2009 Rule.

While this Court previously found the 2009 Rule is an illegal solution to a difficult biological issue, under Ninth Circuit law a constitutional reading of Congress's directive to reissue the Rule is possible. The language "without regard to any other provision of statute or regulation" operates as a talisman that *ipso facto* sweeps aside Separation of Powers concerns. See Consejo de Desarrollo Economico de Mexicali, 482 F.3d at 1168–1169. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motions for summary judgment (dkt ## 26 & 27) are DENIED and Federal Defendants' cross motion for summary judgment (dkt # 52) is GRANTED.

The Clerk of Court is directed to enter judgment in favor of Federal Defendants and against the Plaintiffs and to close the case file.

Dated this 3rd day of August, 2011.

Donald W. Molloy, District Judge
United States District Court